# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JILL and ROBERT WEBB in their own )
proper persons, and as parents and next )
friends of their minor children, )
                            )
       Plaintiffs,              )      Case No. 08 C 6241
                            )
       v.                     )      Judge Amy J. St. Eve
                            )      Magistrate Judge Geraldine Soat Brown
CBS BROADCASTING, INC., a foreign )
Corporation, )
                            )
       Defendant.            )

## <u>MEMORANDUM OPINION AND ORDER</u>

Geraldine Soat Brown, United States Magistrate Judge

This opinion addresses two motions: defendant CBS Broadcasting Inc.'s ("CBS") motion for protective order [dkt 92], and plaintiffs Jill and Robert Webb's ("the Webbs") motion to compel, to enjoin and for sanctions [dkt 109 (under seal)]. The events giving rise to the motions are interrelated although they raise separate legal issues. CBS contends that due to repeatedly irrelevant and improper questioning by the Webbs' counsel at the depositions of several CBS employees, those depositions should be terminated. The Webbs contend that CBS should be ordered to turn over certain CBS documents to which they believe they are entitled, and should be sanctioned for failing to turn them over earlier and obstructing justice. The motions are ruled upon as set out below.[1]

---

[1] The parties' many submissions on these motions are cited as follows: Memorandum in Support of Defendant CBS Broadcasting Inc.'s Motion for Protective Order: "Def.'s Mem." [dkt 93]; Defendant CBS Broadcasting Inc.'s Supplemental Memorandum in Support of Its Motion for Protective Order: "Def.'s Suppl. Mem." [dkt 104]; Plaintiffs' Response to Defendant's Motion for

## BACKGROUND

1. <u>This lawsuit and the joint depositions with the *Jacobson* case</u>

The Webbs assert state law claims of intrusion upon seclusion and intentional infliction of emotional distress allegedly arising from the fact that on July 6, 2007, they, Craig Stebic (Jill Webb's brother), and NBC reporter Amy Jacobson were videotaped without their consent by Tracy Reardon (a neighbor of Craig Stebic) and/or CBS employee Michael Puccinelli. (Am. Compl.) [Dkt 30.] Significantly, the District Judge limited the Webbs' complaint to the invasion of privacy that occurred as a result of the act of videotaping itself, because any allegations or damages related to the subsequent publication of the video by CBS are time-barred. (Mem. Op. & Order, May 7, 2009, at 1, 5, 7-8.) [Dkt 29.] The District Judge permitted the Webbs to file "an amended complaint that alleges damages only based on the videotaping and spying itself, and not based upon any publication." (*Id.* at 8.) When CBS moved to dismiss the amended complaint, the District Judge denied that motion but reiterated the limitation, viewing the factual allegations about the publication of the videotape as "simply to provide further context to the factual allegations." (Order, Sept. 3, 2009 at 2.) [Dkt 42.]

---

Protective Order: "Pls.' Resp." [dkt 119 (under seal), 124]; Supplement to Plaintiffs' . . . Response to Defendant's Motion for a Protective Order: "Pls.' Suppl. Resp." [dkt 128 (under seal), 130]; Plaintiffs' Motion to Compel, Plaintiffs' Motion to Enjoin, and Plaintiffs' Motion for Sanctions: "Pls.' Mot."; Supplement to Plaintiffs' Motion to Compel, Plaintiffs' Motion to Enjoin, and Plaintiffs' Motion for Sanctions: "Pls.' Suppl. Mot." [dkt 111]; Defendant CBS Broadcasting Inc.'s Consolidated (1) Memorandum in Opposition to Plaintiffs' Motion to Compel, to Enjoin and for Sanctions; and (2) Reply Memorandum in Support of its Motion for Protective Order: "Def.'s Reply" [dkt 132]; Plaintiffs' Reply to Defendant's Response to Plaintiffs' Motion to Compel, to Enjoin, and for Sanctions: "Pls.' Reply" [dkt 139 (under seal), 141]; Defendant CBS Broadcasting, Inc.'s Surreply in Opposition to Plaintiffs' Motion to Compel, to Enjoin and for Sanctions: "Def.'s Surreply" [dkt 144.].

The parties scheduled the depositions of several current and former CBS employees for August 2010, agreeing to attempt to conduct them in conjunction with those in a related state court case, *Jacobson v. CBS Broadcasting, Inc.*, No. 2008-L-007331 (Cir. Ct. Cook Co., Ill.) ("*Jacobson* case"). (Jt. Status Rpt. at 2.) [Dkt 48.] The Webbs' counsel does not represent any party in the *Jacobson* case. Amy Jacobson is apparently represented in that case by attorneys from the Law Offices of Kathleen T. Zellner.

Four depositions went forward in August 2010: Michael Puccinelli, Carol Fowler, Robert Johnson and Elizabeth Fruehling, although with much contention and drama, as discussed below.[2] The deposition of Joseph Ahern was also scheduled to proceed jointly, but only went forward in the state court case, not in this case. Fact discovery closed on October 27, 2010, except to complete previously-noticed discovery and any further discovery ordered pursuant to the pending motions. (Orders, Mar. 8, 2010, Oct. 26, 2010.) [Dkt 65, 145.]

2.     Events before and during the depositions

CBS agreed that Ms. Fowler, Mr. Johnson, Mr. Puccinelli and Mr. Ahern would be made available for depositions when the Webbs agreed to dismiss them as defendants in January 2009. (Stip. Agreed Order Dismissal.) [Dkt 22.] Of the four, only Mr. Puccinelli was present while the video was being recorded. Mr. Puccinelli was deposed on August 18, 2010 for approximately eight and one-half hours less a lunch break. Although it was planned to be a joint deposition, the Webbs'

---

[2] All of the deposition transcripts at issue here have been filed under seal and provided to the court: Def.'s Mem., Exs. E (Michael Puccinelli Dep.) and F (Carol Fowler Dep.), and Def's Suppl. Mem., Exs. A (Robert Johnson Dep.) and C (Elizabeth Fruehling Dep.). (Order, Sept. 20, 2010.) [Dkt 108.]

counsel's questions took all of the time. At the conclusion, CBS agreed to make Mr. Puccinelli available for an additional three hours of deposition by counsel in the *Jacobson* case. (Puccinelli Dep. at 306.) The parties also agreed that, for the remaining depositions, the attorneys for the plaintiff in the *Jacobson* case would interrogate the witness for the first three hours and the Webbs' counsel could follow with questions relevant to their case. (*Id.* at 306.)

Prior to the depositions, the Webbs' counsel somehow came into possession of certain documents that had been produced by CBS to the plaintiff in the *Jacobson* case. They were all marked "confidential" and Bates-stamped with "CBS 2 Jacobson" numbers 1 through 443 (hereinafter "*Jacobson* documents"). (Pls.' Suppl. Resp. ¶ 11.) According to the Webbs, the *Jacobson* documents include e-mails, memos, and handwritten notes which were not produced by CBS in the present litigation. (Pls.' Mot. Compel ¶ 20.) Those documents are subject to a protective order entered in the *Jacobson* case. (*See* Def.'s Mem., Ex. C, *Jacobson* Protective Order.) When the Webbs' counsel asked Mr. Puccinelli about some of the *Jacobson* documents, CBS's counsel protested that the Webbs' counsel should not have been given those documents, and that his possession of them violated the protective order in the *Jacobson* case. (Puccinelli Dep. at 220-22.)[3]

Ms. Fowler's deposition took place on August 20, 2010, beginning with questioning by counsel for Amy Jacobson. (Fowler Dep. at 4-185.) Before the Webbs' counsel began his questioning, CBS's counsel warned the Webbs' counsel that, based what happened at Mr. Puccinelli's deposition, he would not permit questioning beyond the scope of the issues in the Webbs' case. (*Id.* at 187.) The Webbs' counsel asked questions regarding the *Jacobson* documents,

---

[3] The Webbs' counsel declined to say how he got the documents: "I don't have any idea. I'm just telling you I've got it." (Puccinelli Dep. at 220.)

and CBS's counsel again objected that those documents should not have been given to anyone other than counsel for Amy Jacobson. (*Id*. at 200.) After the Webbs' counsel questioned Ms. Fowler for several hours, CBS's counsel terminated the deposition because of questions about the *Jacobson* documents and questions that CBS's counsel believed to be improper and abusive. (*Id.* at 308-09.)

Counsel in the *Jacobson* case took Mr. Johnson's deposition on the morning of August 24, 2010, and the Webbs' counsel, who had been present for the morning session, deposed him beginning at 12:15 p.m. (Johnson Dep. at 1, 6.) At 2:00 p.m., CBS's counsel terminated the deposition, citing a previous agreement that because Mr. Johnson would not be available past 2:00 p.m., the deposition would conclude then. (*Id*. at 94; Def.'s Suppl. Mem., Ex. B.) The Webbs' counsel protested. (Johnson Dep. at 94.)

That scenario repeated following day, August 25, 2010. Counsel in the *Jacobson* case took Ms. Fruehling's deposition in the morning, and the Webbs' counsel, who was present for the morning session, deposed her beginning at 1 p.m. (Fruehling Dep. at 1.) At 4:24 p.m., CBS's counsel terminated the deposition. (*Id.* at 141-42.) CBS complains that the Webbs' counsel questioned Ms. Fruehling about matters unrelated to the Webbs' claims, including asking "inappropriate and bizarre questions," and questions about the *Jacobson* documents. (Def.'s Suppl. Mem. at 4-5.)

The Webbs' counsel, however, no longer had the *Jacobson* documents, only his notes about them. Sometime before Ms. Fruehling's deposition, according to the Webbs' counsel, he left his briefcase at Ms. Zellner's office, and his "file ha[d] been riffled." (Fruehling Dep. at 129.) The Webbs claim that the documents were "purloined" from their counsel. (Pls.' Supp. Mot. ¶ 20.) On August 23, CBS's counsel sent a letter to the Webbs' counsel stating that Ms. Zellner "has taken

possession from you of the confidential materials that were inadvertently provided to you." (Def.'s Mem. Ex. D.)

On August 27, 2010, the day for Mr. Ahern's deposition, the Webbs' counsel received a letter from Ms. Zellner stating that she would not make her conference room available to the Webbs' counsel for any further depositions and that all future discovery in the *Jacobson* case would be conducted separately from discovery in the Webbs' case. (Pls.' Mot. ¶¶ 9-10, Ex. 5.) CBS states that its counsel called the Webbs' counsel to confirm that Mr. Ahern's deposition would go forward in the Webbs' counsel's office that afternoon, presumably after counsel in the *Jacobson* case completed the morning session, but that the Webbs' counsel declined to proceed. (Def.'s Suppl. Mem. at 6-7.)[4]

# DISCUSSION

## I.    CBS's Motion for Protective Order

CBS requests a protective order pursuant to Federal Rules of Civil Procedure 30(d)(3) and 26(c)(1) terminating the depositions of Ms. Fowler, Mr. Johnson and Ms. Fruehling, and ordering that Mr. Ahern's deposition not proceed.[5] (Def.'s Suppl. Mem. at 7, Def.'s Reply at 2.) CBS argues, in essence, that the time the Webbs' counsel has already had to question them (Ms. Fowler, 2.5

---

[4] CBS states that the deposition date was August 26, but the transcript reflects that Mr. Ahern's deposition was taken by Ms. Zellner on August 27, 2010. (Def.'s Suppl. Mem. at 6, Def.'s Reply, Ex. D.)

[5] To the extent that the Webbs suggest that Mr. Puccinelli's deposition resume, CBS also seeks an order terminating his deposition. (Def.'s Reply at 2.) Mr. Puccinelli's deposition has run its seven-hour course. If the Webbs are suggesting that Mr. Puccinelli be compelled to reappear for an additional deposition, that request is denied.

hours; Mr. Johnson, 1 hour and 45 minutes; Ms. Fruehling, 3.5 hours: Mr. Puccinelli, 8.5 hours minus breaks), is more than sufficient for the limited issues of this case, especially considering the questioning by counsel in the *Jacobson* case. CBS contends that the Webbs' counsel's questioning veered off into strange and irrelevant topics. Specifically, CBS argues that the Webbs' counsel: 1) asked questions about matters beyond the scope of the District Judge's May 7, 2009 order; 2) asked questions about the *Jacobson* documents; and 3) asked "bizarre" and harassing questions.

The deposition transcript of Mr. Puccinelli confirms CBS's characterization. After questioning Mr. Puccinelli extensively about the decision to make the videotape and his involvement in it, the Webbs' counsel pursued a long line of questions about the editing and broadcasting process, including who decided to air the footage, how scripts and memoranda were created relating to the broadcast, how it came to be posted on the CBS website, and the public response to the broadcast. (Puccinelli Dep. at 231-32, 269-73, 278-80, 283-96, 298-302.) He also repeatedly questioned Mr. Puccinelli about his opinion of Amy Jacobson's physical appearance in her bathing suit. (*Id.* at 199-200 (asking if Mr. Puccinelli had ever commented that "Jacobson really looks hot" or "looks hot in a bathing suit"), 210, 252-53 (asking if he had ever commented "about Amy Jacobson showing a little too much breast at the poolside").)

Ms. Fowler's deposition took a similar course. The Webbs' counsel was present while counsel in the *Jacobson* case asked Ms. Fowler, former Vice-President and News Director at CBS, questions about the videotaping. (Fowler Dep. at 9, 49-69.) The Webbs' counsel then also questioned Ms. Fowler about the videotaping. (*Id.* at 222-23, 234-36, 272-78, 284-86.) However, the bulk of his questions related to the editing and broadcast of the videotape, including how the scripts were prepared and the response from viewers. (*Id.* at 199-203, 229-44.) He also asked Ms.

Fowler questions about her family, whether she allows her daughters to wear bikinis, and whether she would object to her daughters being filmed in bikinis.  (*Id.* at 218-20.) CBS's counsel objected to many of the questions, but he only occasionally instructed the witness to not to answer.[6] CBS eventually terminated the deposition after repeated questions about the *Jacobson* documents.  (*Id.* at 303, 306-09.)

The Webbs' counsel asked similar questions of Mr. Johnson, a news anchor at CBS. The Webbs' counsel questioned him about his communications to other CBS staff about the video footage, where those communications were stored, and the transmission and editing of the videotape in the CBS studio.  (Johnson Dep. at 4-31, 50-60, 70-72.)  Subject to numerous objections from CBS counsel, the Webbs' counsel also inquired whether Mr. Johnson thinks Ms. Jacobson and Ms. Webb are attractive, whether he noticed their bathing suits in the video, and whether Craig Stebic was touching the "private parts" of the women in the video.  (*Id.* at 60-67 (asking if Amy Jacobson is "a rather comely and attractive lady," and whether anyone had commented that she "looks good in that film," or "is pretty hot").)  The Webbs' counsel also asked about some of the *Jacobson* documents.  (*Id.* at 79-80.)

The Webbs' counsel asked Ms. Fruehling,  Managing Editor at CBS, a number of questions about the decision to send Mr. Puccinelli to film around the Stebic home.  (Fruehling Dep*.* at 76-81, 94-97.)  He also questioned her about the editing and airing of the video on the CBS news and the website as well as the communications among CBS staff relating to the airing of the video.  (*Id.* at

---

[6]  For example, CBS's counsel allowed the witness to answer the question "Had you made up your mind on the 6th of July 2007 that Craig Stebic had murdered his wife?" but would not permit the witness to answer "Do you know where Lisa Stebic [Craig Stebic's missing wife] is?" (Fowler Dep. at 257-58.)

7, 23-25, 74-75, 106, 124-35.) In addition, he attempted to question her about the content of the *Jacobson* documents related to the broadcast of the video. (*Id.* at 128-40.) Further, he asked Ms. Fruehling a series of questions about videotaping women with "wonderful tight bodies with nice bathing suits on," whether she or her daughters wear bikinis, and whether she would be comfortable being photographed in a bathing suit. (*Id.* at 72-75.) CBS's counsel terminated the deposition after the Webbs' counsel asked more questions about the *Jacobson* documents sent internally by staff at CBS. (*Id.* at 141-42.)

The scope of discovery is generally broad: any nonprivileged matter that is relevant to any party's claim or defense and that is admissible evidence or reasonably calculated to lead to admissible evidence. Fed. R. Civ. P. 26(b)(1). But discovery is also limited by Federal Rule of Civil Procedure 26(b)(2)(C), which provides that a court must, on a motion or on its own, limit the frequency or extent of discovery if it determines that:

> (I) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
>
> (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or
>
> (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

A party may move a court at any time during a deposition "to terminate or limit it on the ground that it is being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses the deponent or party." Fed. R. Civ. P. 30(d)(3)(A). If the party has made a sufficient showing, Federal Rule of Civil Procedure 30(d)(3)(B) permits the court to order that the deposition

be terminated or may enter a protective order pursuant to Rule 26(c). Rule 26(c), in turn, provides that the court may for good cause issue an order limiting or forbidding a deposition to proceed in order "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."

Rule 26(b)(2)(C) requires the court to consider the issues in the case when deciding limits on discovery. At issue in this case are the Webbs' "claims for both intrusion upon seclusion and intentional infliction of emotional distress *based on the act of videotaping itself* . . . ." (Order, Sept. 3, 2009 at 2 (emphasis added).) The Webbs' damages are limited to their allegations that "they were harmed by the act of videotaping itself . . . ." (Mem. Op. and Order, May 7, 2009 at 6.) CBS's motion to dismiss was granted "with respect to any allegations based upon *publication* of the videotape at issue." (*Id.* at 1 (emphasis in original).) The order allowed the Webbs leave to file an amended complaint but required that "allegations regarding publication, writing, or reporting about the incident" not be included in it. (*Id.* at 6.) The District Judge subsequently declined to strip the amended complaint of any references to the broadcast on the assumption that they were included "simply to provide further context to the factual allegations." (Order, Sept. 3, 2009 at 2.)

The decision to dismiss any claims arising from publication of the videotape was not a close question. The Webbs conceded that their claims of "false light" and "publication of private facts" are time-barred. (Mem. Op. and Order, May 7, 2009 at 3.) Because any claims relating to the broadcast are time-barred, and the only event at issue is the act of videotaping, discovery must be similarly limited. The decision to videotape, the process of doing the videotaping, and the Webbs' damages from the act of videotaping are relevant. The decision to broadcast, the editing of the videotape and the results of the broadcast are *not* relevant.

The Webbs' response to CBS's motion suggests that the Webbs see their case as much broader than it is. For example, the Webbs' legal argument is based on cases relating to publication and damages caused by publication. (Pls.' Resp. at 3-4.) Publication is not an issue in this case. They argue that "[i]ntent by a defendant to cause, or a reckless disregard of the probability of causing severe emotional distress are issues in this cause." (*Id*. at 4.) That may well be, but in this case, the cause of distress must be the videotaping, not the broadcasting, and the relevant intent is the intent to videotape, not the intent to broadcast.

Although the Webbs' view of this case is misplaced, it appears to be sincerely held, and thus, the court does not find that the questioning was in bad faith, with the exception of the questions about the *Jacobson* documents discussed below. But the questioning certainly exceeded the limits of the case, and went over the line in a manner that unreasonably annoyed, embarrassed, or oppressed the witnesses and CBS. *See* Fed. R. Civ. P. 30(d)(3)(A). "Runaway" discovery that has little relevance to the case and is "excessive, burdensome, unnecessary, and intrusive" justifies resorting to court intervention. *Eggleston v. Chi. Journeymen Plumbers' Loc. Union No. 130, U.A.*, 657 F.2d 890, 901-03 (7th Cir. 1981)*; see also Redwood v. Dobson*, 476 F.3d 462, 467-69 (7th Cir. 2007) (repeated personal questions of dubious relevance may be enough to meet Rule 30(d)(3) standard).

Rule 26(b)(2)(C) provides another reason why the depositions of Mr. Johnson, Ms. Fowler, and Ms. Fruehling must be curtailed. The Webbs' response to CBS's motion fails to identify any specific questions that the witness did not answer based on the instruction of counsel or, indeed, any subject areas that the Webbs' counsel did not have an opportunity to explore, except as to the *Jacobson* documents and questions as to which CBS invoked the reporter's privilege, which are

discussed below. Reviewing the deposition transcripts, it appears that the Webbs' counsel got answers to his other questions, notwithstanding CBS's counsel's objections and the sometimes heated colloquy between the lawyers. Although CBS terminated Mr. Johnson's deposition because he had to leave at 2 p.m., the Webbs' counsel had sufficient time to question him, as illustrated by the fact that the Webbs' counsel spent some of the available time asking whether CBS uses carrier pigeons, smoke signals or drum beats to communicate. (Johnson Dep. at 17-18.) Applying the standards in Rule 26(b)(2)(C), there is no additional deposition testimony needed of Mr. Johnson, Ms. Fowler, and Ms. Fruehling, with the following proviso: if there are documents that CBS should have produced prior to the depositions but did not, and if, as a result, the Webbs' counsel was unable to question the witnesses about documents CBS should have produced, then the depositions must be resumed for questioning about those documents only.

Notably, the Webbs fail to state any reason why Joseph Ahern should be deposed. However, CBS did agree to make him available for deposition. CBS must make him available for deposition, but CBS's motion is granted as follows: Mr. Ahern's deposition is limited to three hours and limited to the issues in this case.


II.    The Webbs' Motion to Compel, to Enjoin and for Sanctions

Identifying the issues in the Webbs' motion has been challenging and time-consuming. The Webbs argue that documents CBS produced in the *Jacobson* case should have been produced to them, and because they were not, CBS is obstructing discovery. There are many assumptions built into that conclusion, and multiple steps to analyzing whether, in fact, the Webbs have been deprived of relevant discovery. This opinion breaks out those steps.

12

A.     The Webbs' document requests

Prior to the depositions, the Webbs served a document request on March 10, 2009, listing six categories.[7]  CBS objected to producing documents not relevant or likely to lead to admissible evidence, but, except for the requests for broadcast scripts (Request 3) and trial exhibits (Request 6), agreed to produce responsive, non-privileged documents.  (Pls.' Suppl. Mot., Ex. 3.)  In CBS's view, documents relating solely to the broadcast or posting of the videotape are not relevant; as a result, CBS did not produce such documents and redacted portions of some documents that it did produce.  (Def.'s Reply at 4.)

The Webbs' initial document requests were quite narrow.  For example, the Webbs requested "[a] copy of every *edited* version of the footage of the July 6, 2007 footage of the Stebic home whether or not it was broadcast."  (Pls.' Suppl. Mot, Ex. 1, Request 2 (emphasis added).)  After the deposition of Mr. Puccinelli, the Webbs' counsel wrote to CBS's counsel asking for, *inter alia*, "unedited and raw footage." (Pls.' Mot., Ex. 1 ¶ 5.)  But Rule 34 only required CBS to produce what the Webbs requested.  The fact that the Webbs' counsel may have realized at the depositions that there was material he had not requested doesn't make CBS's prior response incomplete.

Likewise, the Webbs' document request asked for "notes" or "memoranda" of CBS

_____

[7] The Webbs' first request sought the following: 1) any documents referred to in answering the Webbs' first set of interrogatories to CBS; 2) a copy of every edited version of the July 6, 2007 footage; 3) a copy of all the versions of the scripts used in any broadcast regarding the July 6, 2007 footage; 4) a copy of all notes from all CBS employees or contractors regarding the July 6, 2007 footage; 5) a copy of all memoranda among CBS employees or contractors regarding the July 6, 2007 footage; and 6) any document relating to the subject of litigation that CBS plans to rely on during trial.  (Pls.' Suppl. Mot., Ex. 1.)

employees or contractors regarding the footage of the Stebic home. (Pls.' Suppl. Mot, Ex. 1, Requests 4 and 5.) CBS points out that the terms "notes" and "memoranda" were defined in the Webbs' document request as a *subset* of the broadly defined term "document," and, as a result CBS only produced what could reasonably be defined as "notes" and "memoranda." (Def.'s Reply at 3 n. 3.) Because "electronic mail" was another term, separate from "notes" and "memoranda," CBS did not view the Webbs' Requests 4 and 5 as calling for e-mail. (*Id*.) Again, CBS was only required to produce what the Webbs requested.

The Webbs state, "CBS had provided plaintiffs no notes, e-mails, recordings, scripts or other documentation before submitting its employees for deposition in the cause." (Pls.' Suppl. Mot. ¶ 9.) CBS, however, disputes that. It says that during the week of March 10, 2010, after the entry of the agreed protective order, it produced documents "includ[ing] handwritten notes of then-CBS employees Carol Fowler and Joe Ahern, email received by CBS from plaintiff Jill Webb, memoranda circulated between CBS personnel, and edited versions of the videotape." (Def.'s Reply at 3 (footnote omitted).) Notably, until their current motion, the Webbs had not brought a motion to compel any discovery from CBS.

From August 20 to August 25, 2010, during the course of the depositions, the Webbs' counsel sent a series of letters to CBS's counsel identifying more than twenty categories of documents and things to be produced. (Pls.' Mot., Exs. 1-4.) Many of those categories were duplicative, overlapping, and continuously expanding. For example, on August 20, the Webbs' counsel asked for the mirror image of the hard drive from Mr. Puccinelli's laptop and desk computers. (Pls.' Mot., Ex. 1 ¶ 1.) On August 24, the Webbs' counsel asked for the mirror image of the hard drives of all of the computers of all of the persons who were previously named as

individual defendants, as well as the "hard drives of the CBS server that preserved the information on those computers." (*Id.*, Ex. 3 at 2.) Then, on August 25, the Webbs' counsel asked for "a mirror image of the hard drive of any and all CBS-TV Chicago servers that retain the information any and all computers used by CBS-TV Chicago employees during the time of the Stebic investigation." (*Id.*, Ex. 4 ¶ 2.)[8]

CBS treated those letters as document requests and served a formal response, objecting to most categories. (Def.'s Reply, Ex. A.) On October 1, 2010, CBS produced 54 additional pages of documents, including internal e-mails between CBS personnel, portions of Mr. Pucinnelli's cell-phone records for July 6, 2007, and an unedited version of the videotape at issue. (Def.'s Reply at 6.) The Webbs dispute that those represent all the responsive documents. (Pls.' Suppl. Resp. ¶¶ 1, 6.)

The Webbs' motion fails to distinguish between what they requested before the depositions and what they requested during and after the depositions. That distinction is significant. The Webbs were only deprived of a fair opportunity to question the witnesses if there are non-privileged, responsive documents that CBS should have produced before the depositions but did not. That is necessarily limited to documents sought in the Webbs' initial request. Absent some agreement (which was not reached here), CBS was not required to produce documents sought in the supplemental requests that the Webbs' counsel sent during and after the depositions until the 30 days provided by Rule 34(b)(2)(A).[9]

---

[8] Ironically, the parties initially told the court, "The parties are not anticipating discovery of any Electronically Stored Information (ESI)." (Jt. Status Rpt. ¶ 6.)

[9] In March 2009, the Webbs served notices for depositions to be taken in April and May 2009. (Pls.' Suppl. Mot., Ex. 2.) Each notice directed the deponent to produce "any and all written

## B.    The Webbs' motion

In their motion, the Webbs essentially seek: 1) all notes, correspondence, memoranda, and e-mails kept by and/or sent by anyone at CBS related to the Stebic investigation, the July 6, 2007 recording, and the subsequent use of that recording, and, specifically, the *Jacobson* documents; 2) mirror images of the hard drives of various CBS computers; 3) cell phone billing records of CBS employees and others; and 4) documents pertaining to CBS legal training and training relating to privacy of individuals. (Pls.' Mot., Exs. 1-4.)[10]

## C.    Limits on discovery

### 1.    *Relevance*

The scope of document discovery is the same as deposition discovery: it must be relevant to a party's claim or defense, and admissible or reasonably calculated to lead to admissible evidence. Fed. R. Civ. P. 26(b)(1). As set out above, the videotaping and any damages flowing from the act of videotaping are relevant. The editing, broadcasting, and publication of the videotape are not relevant. Discovery about the broadcasting and publication of the videotape is not likely to lead to relevant evidence, and to allow such discovery would fail to respect the time-bar.

---

reports, records, memoranda, notes, photographs, books, exhibits and other evidence in his/her possession concerning this lawsuit." (*Id*.) The Webbs, for good reason, do not cite those notices as a basis for their motion. First, as the Webbs subsequently acknowledged, they were sent prematurely. (*See* Plaintiff's Mot. Set R. 16 Conf. ¶ 4.) [Dkt 25.] A party may not seek discovery before the parties' meeting pursuant to Federal Rule of Civil Procedure 26(f). Fed. R. Civ. P. 26(d)(1). Both sides subsequently ignored those notices. Second, the direction is so patently overbroad it could not be enforced as a document request or a subpoena.

[10] They also seek all versions of the videotape CBS created, including the unedited and raw footage made on July 6, 2007, but it appears CBS produced a copy of the unedited version of the videotape after the Webbs' motion was filed. (Def.'s Reply at 6.)

2.    *Privileges*

CBS says that it redacted some of the documents on the basis of the attorney-client privilege, or the reporter's privilege, and that it served a privilege log. (Def.'s Reply at 4 n. 5.)  Privileges must be addressed on a document-by-document and question-by-question basis.  *U.S. v. Lawless*, 709 F.2d 485, 487 (7th Cir. 1983).  The Webbs do not identify in their submissions any particular entries on CBS's privilege log or any particular deposition questions as to which they challenge CBS's assertion of privilege.  Therefore, it is impossible for the court to address whether any assertion of privilege was justified or not.

The Webbs are simply incorrect, however, to argue that CBS cannot assert the reporter's privilege that exists under Illinois state law (735 Ill. Comp. Stat. 5/8-901, *et seq*.) in this case.  (*See* Pls.' Reply at 4-5.)  The Webbs cite decisions holding that the reporter's privilege does not apply in a federal question case.  (*Id*.)  This, however, is not a federal question case.  This case was removed to federal court on the basis of diversity jurisdiction.  (Notice Rem.)  [Dkt 1.]   The Webbs' claims here arise under state common law.  Federal Rule of Evidence 501 provides:

> [I]n civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

The privileges provided by Illinois law are to be applied to the Webbs' Illinois state law claims.

D.    The *Jacobson* documents

As described above, the Webbs' counsel somehow got copies of documents CBS had produced in the *Jacobson* case.  The Webbs' motion describes (practically verbatim, with Bates-

numbers) approximately 28 of the *Jacobson* documents, mostly e-mails, that the Webbs counsel looked at and took notes of before he says they were "purloined from his files." (Pls.' Mot. ¶ 20.) In addition, the Webbs say, there are approximately 100 pages of handwritten notes. (*Id.* ¶ 21.) The Webbs complain that CBS did not produce those documents in this case, and that their counsel was not permitted to ask questions about any of them. (*Id*. ¶¶ 20, 22.)

CBS says that it had produced two of the *Jacobson* documents listed in the Webbs' motion in response to the first document request: a July 10, 2007 e-mail by Ms. Fowler and an e-mail from Jill Webb to CBS. (Def.'s Reply at 6 n. 7.) CBS also states that, in response to the Webbs' supplemental requests, it produced seven more. (*Id.*) But CBS says that it did not produce to the Webbs some documents that were produced in the *Jacobson* case because the claims in this case are narrower than the claims in the *Jacobson* case, which includes claims relating to broadcasting and publication that were stricken in this case. (*Id*. at 7.)

It is not surprising that documents were produced in the *Jacobson* case that were not produced in this case, for the very reason identified by CBS: the *Jacobson* case involves claims that this case does not. CBS agreed to produce for deposition the individuals who were dismissed from this case and agreed to "seek to schedule depositions in conjunction with the *Jacobson* case so that the overlapping witnesses need not sit for two depositions." (Jt. Status Rpt. ¶ 5.) But the Webbs do not point to any agreement that discovery or document production here would be co-extensive with the *Jacobson* case.

The *Jacobson* documents obtained by the Webbs' counsel are covered by a protective order entered by the state court, which provides that "confidential" information will be used "solely for purposes of this [the *Jacobson*] action," and disclosure will be limited to specific categories of

18

persons including Ms. Jacobson, her counsel and her counsel's staff. (*Jacobson* Protective Order ¶ 5.) Those categories do not include the Webbs or their counsel. "[U]nder no circumstances" are counsel in the *Jacobson* case permitted to allow "counsel for any other person or entity to review documents . . . produced pursuant to th[at] Order or any copies thereof." (*Id.* ¶ 6.)

The Webbs' counsel's use of the *Jacobson* documents was contrary to the protective order in the *Jacobson* case. The Webbs' counsel knew the documents were subject to the protective order because the documents are stamped "confidential under protective order," and CBS's counsel cited the protective order when the Webbs' counsel first used them at Mr. Puccinelli's deposition. (Puccinelli Dep. at 221-22, Ex. 11, 40, 65.) The Webbs' submissions to this court do not explain how their counsel obtained the documents, nor do they attempt to justify his violating the protective order, except to argue that the documents should have been produced in this case.

Violating a court order is a serious matter. Violation of an unequivocal command from a court subjects the offender to sanctions and contempt of court. *See Grove Fresh Dist., Inc. v. John Labatt, Ltd.*, 299 F.3d 635, 642 (7th Cir. 2002) (affirming contempt holding for disclosing information specifically disallowed by court order); *Marrocco v. General Motors Corp.*, 966 F.2d 220, 224-25 (7th Cir. 1992) (holding that a flagrant disregard of a court's protective order, even if not intentional, was sanctionable). The Webbs' counsel's actions are not justified by his belief that the documents should have been produced in this case. It was foreseeable that CBS's production in the *Jacobson* case would be greater than in this case, and CBS effectively said as much in its response to the Webbs' document requests by objecting to producing documents not relevant to "matters at issue in this action." (Pls.' Suppl. Mot., Ex. 3 ¶ 4.) The Webbs's counsel should have discussed with CBS's counsel whether CBS was producing documents in the *Jacobson* case that were not produced here,

and if necessary, brought a motion to this court in advance of the depositions. What the Webbs' counsel should *not* have done was to obtain the documents in some way that he would not disclose and then use them in violation of the protective order.

CBS could properly instruct its witnesses not to answer the Webbs' counsel's questions based on the *Jacobson* documents because those questions violated the protective order entered in that case. "A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3)." Fed. R. Civ. P. 30(c)(2). CBS then promptly brought its motion for a protective order under Rule 30(d)(3).

The court is not convinced, based on the Webbs' descriptions of the unproduced *Jacobson* documents, that they are, in fact, within the scope of discovery here. To put the issue to rest, however, the court will review them *in camera*, with the exception discussed below. CBS shall deliver the *Jacobson* documents (Bates numbered 1-443) for *in camera* inspection no later than seven business days after the date of this order. In its transmission letter (which shall be copied to the Webbs' counsel), CBS shall identify by Bates number which documents were produced to the Webbs and state the date those documents were produced to them. For any that were produced to the Webbs in a redacted format, an unredacted copy shall be provided to the court showing what was redacted. If it appears that any of the documents are within the scope of discovery here, they shall be ordered produced. If any were properly sought in the Webbs' initial document request, so that the Webbs' counsel should have had them for the depositions, CBS will be ordered to produce the witnesses again solely for questioning about those documents.

The exception is documents that contain or refer solely to communications with viewers in response to the broadcast. The Webbs claim that "the many e-mails from their audience expressing

outrage and disgust" following the broadcast of the videotape are "clearly relevant," (Pls.' Reply at 4) but the court does not agree. As CBS points out, the Webbs never sought the production of viewer e-mails to CBS, either in their formal Rule 34 requests or in their subsequent correspondence with CBS. (Def.'s Surreply at 1.) Upon reviewing the requests, the court does not find a request that, even construed broadly, could be interpreted as requesting e-mails sent by third parties to CBS. It is too late for the Webbs to be seeking additional documents because fact discovery has closed. More fundamentally, however, this case is about the act of videotaping, not the broadcast, and the response of viewers to a broadcast is not necessarily probative of the response to the act of videotaping *per se*. Furthermore, it is not apparent why the opinion of an individual with no involvement in this case has any relevance. The people who choose to write or e-mail are a self-selected group, not a survey of general public opinion, even assuming a survey would be relevant. The Webbs state that e-mails from that self-selected group "will most certainly 'lead to the discovery of admissible evidence'" (Pls.' Reply at 4), but they do not explain how or what evidence. Rather, discovery regarding what the Webbs call the "flood of e-mails" (*id.*) is more likely to be a distraction from the real issues in this case and a waste of everyone's, including the court's, time. Rule 26(b)(2)(C) authorizes the court to limit such discovery. Thus, CBS shall exclude from its delivery for *in camera* inspection any documents that contain or refer solely to communications with viewers in response to the broadcast and any CBS documents that respond to or relate solely to such communications.

E.     Computer hard drives of CBS and its employees

As described above, the Webbs' counsel first asked for mirror images of the hard drive of Mr. Puccinelli's laptop and desk computer following his deposition. That request ballooned into a request

for "a mirror image of the hard drive of any and all CBS-TV Chicago servers that retain the information any and all computers used by CBS-TV Chicago employees during the time of the Stebic investigation" (Pls.' Mot., Ex. 4 at 2), which is patently overbroad.

CBS objected to the blanket requests for "mirror images" of computer hard drives of CBS personnel but agreed to produce:

> copies of all non-privileged documents, if any, contained in the computers of the referenced persons that are responsive to any of plaintiffs' other requests to the extent they seek the production of documents concerning the video and audio recording made of the backyard of the Stebic residence on July 6 2007, and the circumstances surrounding CBS's obtaining that recording, that are in its possession, custody and/or control.

(Def.'s Reply, Ex. A, Resp. 19.)

CBS's response is adequate. The Webbs have shown no need for a copy of the hard drives of the computers of CBS or its employees, which, at this time (three years after the event) would likely contain vast amounts of irrelevant material. The Webbs' claimed justification for their request is that "Puccinelli testified that he had not even looked in his computers or into his files for any notes and/or other records he might have concerning the recordings he and another CBS employee allegedly made at the Stebic home . . . ." (Pls. Mot. ¶ 2.) But that is not what Mr. Puccinelli testified. He testified that he made a search for all the notes that he had made of the footage at the Stebic home, including searching his laptop, and that he forwarded the results, although he might have done so prior to CBS's response to the document request. (Puccinelli Dep. at 277-280.) Mr. Johnson similarly testified that, after receiving an e-mail to look for communications about the July 6, 2007 filming he made a search but did not have such documents, largely because he was not involved in the videotaping. (Johnson Dep. at 21, 25, 28.) CBS's additional search for any responsive documents

22

that have not been produced is adequate.[11]

F.     Telephone records

Like their requests for computer hard drives, the Webbs' requests for telephone records ballooned. Initially, the Webbs did not request any telephone records,  On August 20, they asked for the telephone records of Mr. Puccinelli's cell phone from July 5, 2007 through July 17, 2007. (Pls.' Mot., Ex. 1 ¶ 8.) By August 25, the Webbs were asking for "the billing statements for each and every cell phone and Black Berry provided by CBS-TV Chicago to its executives, employees, and independent contractors who discussed the recordings at the Stebic home from July 5, 2007 through July 25, 2007." (Pls.' Mot., Ex. 4 ¶5.) CBS has objected to that, but agreed to produce the telephone records Mr. Puccinelli's cell phone for July 6, 2007. (Def.'s Reply, Ex. A Resp. 8, 24.)

CBS's response is sufficient. The Webbs's request for all the billing records of everyone at CBS who discussed the recordings at Stebic home is clearly overbroad, as well as irrelevant. The Webbs do not suggest what they would do with,  or how they would glean admissible evidence or anything likely to lead to admissible evidence from, the sheaves of records that their request would probably generate. Also, Mr. Pucinnelli is not required to appear for a deposition testimony on the subject of his telephone records. The Webbs  have had a full seven hours to depose him, and they did

---

[11] The Webbs may think that their request for copies of CBS's computer hard drives parallels the fact that they permitted CBS to take a mirror image of their computer's hard drive.  But the circumstances are very different. The Webbs volunteered to allow CBS's forensic expert to examine and copy their computer hard drive after they had submitted affidavits saying that they had never possessed any documents responsive to CBS's document requests.  "At their depositions, Plaintiffs offered to defense counsel that, if so desired, they would surrender their computer hard drive for a forensic examination for writings made to blogs by Jill Webb." (Pls.' Resp. Show Cause Order at 3.)  [Dkt 79.]

not request telephone records prior to his deposition. They were not unfairly deprived of an opportunity to depose him about those records.

G.      Documents pertaining to CBS's legal training relating to privacy of individuals

The Webbs' counsel's August 20 letter requested documents and illustrations from a legal training seminar that Mr. Puccinelli testified he attended about a year and a half before his deposition (that is, over a year after the videotaping). (Pls.' Mot., Ex. 1 ¶ 12.) CBS objected on the basis that the documents are irrelevant and protected by attorney-client privilege and work-product protection. (Def.'s Reply, Ex. A. Resp. 11.) The relevance of a legal seminar more than a year after the videotaping is questionable, and Mr. Puccinelli did not recall whether any materials had, in fact, been handed out. (Puccinelli Dep. at 57-61.) While it seems reasonable that documents relating to legal training might be privileged, it is not possible to address this issue in the abstract. If, in fact, there are such documents and the Webbs choose to pursue this topic, they shall first have a conference with CBS's counsel before bringing any further motion.

H.      The Webbs' request for sanctions

The Webbs' motion fails to show that CBS has obstructed discovery or failed to comply with a previous order. Their request for sanctions is denied.

## CONCLUSION

1.    Defendant CBS's motion for protective order is granted, as follows:

(a) The depositions of Robert Johnson, Carol Fowler, and Elizabeth Fruehling are terminated with the following proviso: if this court's *in camera* review shows that there are documents that CBS should have produced prior to the depositions but did not, and if, as a result, the Webbs' counsel was unable to question the witness about documents CBS should have produced, then the depositions must be resumed for questioning about those documents only;

(b) CBS is not required to produce Michael Puccinelli for any additional deposition testimony; and

(c) CBS must make Joseph Ahern available for deposition, but Mr. Ahern's deposition is limited to three hours and limited to the issues in this case.

2.    The Webbs' motion to compel, to enjoin and for sanctions is granted in part and denied in part as follows:

(a)   CBS shall deliver the *Jacobson* documents (Bates numbered 1- 443) for *in camera* inspection no later than seven business days after the date of this order.  In its transmission letter (which shall be copied to the Webbs' counsel), CBS shall identify by Bates number which documents were produced to the Webbs and state the date those documents were produced to them.  For any that were produced to the Webbs in a redacted format, an unredacted copy shall be provided to the court showing what was redacted.  If it appears that any of the documents are within the scope of discovery here, they shall be ordered produced. If any were properly sought in the Webbs' initial document request, so that the Webbs'

counsel should have had them for the depositions, CBS will be ordered to produce the witnesses again solely for questioning about those documents. CBS shall exclude from its delivery for *in camera* inspection any documents that contain or refer solely to communications with viewers in response to the broadcast and any CBS documents that respond to or relate solely to such communications; and

(b) In all other respects, the Webbs' motion is denied.


**IT IS SO ORDERED.**


_Geraldine Soat Brown_
GERALDINE SOAT BROWN
UNITED STATES MAGISTRATE JUDGE


JANUARY 13, 2011