**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JILL and ROBERT WEBB in their own** | ) | |
| **proper persons, and as parents and next** | ) | |
| **friends of their minor children,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No. 08 C 6241** |
| | ) | |
| **v.** | ) | **Judge Amy St.  Eve** |
| | ) | **Magistrate Judge Geraldine Soat Brown** |
| **CBS BROADCASTING, INC., a foreign** | ) | |
| **Corporation,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Geraldine Soat Brown, United States Magistrate Judge

Before the court are two motions filed by defendant CBS Broadcasting, Inc. ("CBS"),

requesting sanctions against plaintiffs Jill and Robert Webb ("the Webbs"): CBS's Renewed Motion

for Sanctions [dkt 133], and CBS's Motion to Compel Return of Confidential Documents and to

Dismiss [dkt 191].  In addition, CBS has filed a Supplemental Memorandum in support of the latter

motion.  [Dkt 210.]  For the reasons explained below, those motions are granted as set out below.

## INTRODUCTION

This case involves a single incident – the videotaping of the Webbs, Craig Stebic (Jill

Webb's brother) and reporter Amy Jacobson without their consent on July 6, 2007.  The discovery

phase has, however, necessitated four opinions before this one.  (*See* May 25, 2010 Op. [dkt 77];

Oct. 5, 2010 Op. [dkt 127]; Jan. 13, 2011 Op. [dkt 179]; and March 8, 2011 Op. [dkt 208].)  To the

extent the background is discussed in those opinions, it will not be repeated here.[1]

In essence, CBS's current filings present three events that CBS believes justify sanctions

against the Webbs, including the ultimate sanction of dismissal.

First, the Webbs failed to produced documents CBS requested in discovery and filed

affidavits saying they had no such documents.  Later, responsive documents were found on both the

Webbs' home computer and in hard copies kept in Robert Webb's file cabinet.

Second, following this court's January 11, 2011 Opinion, which dealt in part with the

"*Jacobson* documents," CBS learned that at even while the Webbs' counsel was representing to the

court and CBS that those documents had been "purloined" from his file, he was, in fact, retaining

copies of those documents.

Third, in December 2010, CBS learned that the Webbs served a subpoena on the Plainfield,

Illinois Police Department, notwithstanding an order entered on October 26, 2010 stating that no

additional discovery could be noticed or served without the court's permission.  CBS was not served

with notice of the subpoena as required by Federal Rule of Civil Procedure 45(b)(1), and the

documents sought in the subpoena appear to have no relevance to this case.

---

[1]  Because this opinion discusses many of the filings in the docket of this case that now
exceeds 200 docket entries, most documents will be cited only by their docket number in the interest
of brevity.

**FINDINGS**

**I.      The search of the Webbs' computer and their continued depositions**

In its renewed motion for sanctions, CBS seeks costs incurred in conducting a forensic examination of the Webbs' computer, re-deposing the Webbs about documents found on the computer as well as other documents the Webbs belatedly produced, and bringing the renewed motion for sanctions.  (Dkt 133 at 1; dkt 168 at 1.)  This has a complicated backstory.

A.      The first sanctions order

The facts giving rise to the first order entering sanctions against the Webbs and their counsel were set out in the May 25, 2010 Opinion entering those sanctions.  Those facts are described here only to the extent necessary as background to CBS's renewed motion.

CBS originally served interrogatories and document requests on the Webbs in November 2009. (Dkt 52, Ex. A.)  The Webbs did not respond to those requests by February 19, 2010, the date ordered by this court and a day later than the Webbs had agreed to respond.  (Dkt 48, 49.)  After CBS filed a motion for sanctions on February 26 (dkt 50), the Webbs sent their responses, which were incomplete, unverified, and produced no documents.  (Dkt 54, Ex. A.)  In response to nine of CBS's requests for production of documents, the Webbs responded that they had no responsive documents. (*Id.*)  The Webbs did not respond at all to the other twenty document requests.  (*Id.*)[2]

A hearing was held on CBS's motion for sanctions on March 9, 2010.  (Dkt 65.)  Counsel

---

[2]   The Webbs initially claimed that although their responses were tardy,  they were sent before CBS filed the motion.  (Dkt 55 at 3.)  However, at a March 9, 2010 hearing, the Webbs' counsel told the court that the responses had, in fact, been sent after, and partly in response to, receipt of CBS's motion.  (*See* May 25, 2010 Op. at 4-5.)

3

for the Webbs asserted to the court that they had fully complied with their discovery obligations, and submitted identical affidavits from Jill and Robert Webb who swore, in relevant part:

> 2.    I thoroughly read the [defendant's] Interrogatories and Requests for Production of Documents, understood each of them, and answered them truthfully and completely.
>
> 3.    In response to the Requests for Production of Documents, I considered each request and *did a full search* to see if I was in possession of any of the documents requested.
>
> 4.    *I was not and am not* in possession or control of *any* of the documents requested.

(Dkt 74, 75, Affs. of J. Webb and R. Webb (emphasis added).)  In fact, the Webbs had still not served full responses CBS's requests.

The Webbs and their counsel were sanctioned pursuant to Federal Rule of Civil Procedure 37(b)(2)(C) for failing to comply with the discovery order, and they were subsequently ordered to pay $10,444 to CBS for its fees and costs in bringing the motion for sanctions.  (May 25, 2010 Op.; dkt 127.)  The Webbs were further ordered to serve complete discovery responses no later than June 2, 2010, even if they had no documents to produce.  (May 25, 2010 Op. at 6-7.)  The court questioned the fact that the Webbs had not disclosed documents to support their complaint allegations of "ongoing medical bills" for treatment of mental anguish and emotional distress, but the Webbs' counsel responded that CBS could subpoena those records.  (*See id.* at 9-10.)  Ruling was reserved on the issue of whether the Webbs should be precluded from presenting evidence of economic or monetary damages as a further sanction.  (*Id.* at 9-12.)  The parties thereafter agreed to defer that issue pending the motion for summary judgment CBS intends to file.  (Dkt 85, 135 at 14.)

B.    The first depositions of the Webbs

On June 1 and 2, 2010, CBS deposed the Webbs. (Dkt 83, Exs. 1, 2, Dep. J. Webb, Dep. R. Webb.) Those depositions revealed that, contrary to their affidavits, the Webbs possessed – at least at one time – relevant materials that were not produced, some of which may have been destroyed; that they had failed to conduct a diligent search for documents; and, perhaps most significantly, they had concealed the existence of a report that apparently formed the basis for some of the factual allegations of their complaint.

First, Robert Webb testified that he did not believe he had ever searched the Webbs' computer for discoverable documents, despite his March 5 affidavit swearing that he conducted a "full" search. (R. Webb Dep. at 92-93.) He did not look on the computer to see if there were any e-mails that might be responsive to CBS's requests. (*Id.* at 93.) He searched for "some stuff but . . . [he] was unsure what [they] were looking for." (*Id.*) Jill Webb testified that she searched the computer for e-mails and other documents that might be responsive to CBS's discovery requests, but found nothing, possibly due to a virus infecting the computer. (J. Webb Dep. at 106-07, 342.) The Webbs testified that their home computer had crashed due to one or more viruses including one around February or March 2010, leaving e-mail and other data irretrievable. (J. Webb Dep. at 106-07; R. Webb Dep. at 93-96.) The Webbs had never before disclosed to CBS that potentially relevant documents were irretrievable due to a computer virus. The Webbs offered to surrender their computer voluntarily to CBS for a forensic examination. (Dkt 79 at 3.)

Second, the Webbs testified that Robert Webb had taken photographs of the gathering on July 6 that was the subject of the videotaping, but had not disclosed them to CBS. (R. Webb Dep. at 87-88; J. Webb Dep. at 300.) Robert Webb testified that he believed copies of the digital pictures were

on the Webbs' computer, but that they had not looked for or produced them because they did not think they were "part of" the case. (R. Webb Dep. at 88.)

Third, the Webbs testified that Amy Jacobson had faxed to them a report written by a private investigator Ms. Jacobson or her attorney hired to look into the circumstances behind the July 6 videotaping. (J. Webb Dep. at 343-45; R. Webb Dep. at 113-14.) Jill Webb testified that she received the report from Ms. Jacobson shortly after the investigation was done because she "really, really" wanted to see it. (J. Webb Dep. at 344.)[3] However, Jill Webb could not remember what she had done with the report and testified she had been unable to find it. (*Id.* at 344-45.) Robert Webb testified that Jill Webb "could very possibly" have thrown it away. (R. Webb Dep. at 114.)

C.    The post-deposition document response and production of photographs and medical records

Following their June depositions, the Webbs submitted amended discovery responses to CBS, disclosing the photographs mentioned in the depositions. (Dkt 136, Ex. A.) Other than the photographs and suggesting that CBS could subpoena third-parties, the Webbs responded that they had no further documents responsive to the requests, including e-mail, documents, or other correspondence. (*Id.*) Notwithstanding Jill Webbs' testimony the previous day about getting the investigator's report from Amy Jacobson, the Webbs responded "none" to Request 9, which asked for "[a]ny and all documents referring or relating to your relationship with, including any communication you have had with, Amy Jacobson or her agents, attorneys or representatives." (*Id.*) On June 11, CBS sent a letter to the Webbs' counsel requesting production of the private

_____

[3] The report is dated July 12, 2007. (Dkt 156-4 (under seal).)

investigator's report, if the Webbs had retained it. (Dkt 136, Ex. L.) CBS asserts it never received a response. (Dkt 135 at 9.)

At a June 18, 2010 hearing, the parties reported to the court that the previous day (June 17), the Webbs had produced documents to CBS related to their medical treatment. Those medical records were provided to the court *in camera* and consisted of medical treatment and prescription records for both Mr. and Ms. Webb bearing dates from 2007 through 2010. When and how the records were obtained was not made clear, although several bore a fax header with the date "6/7/2010."

### D.    The search of the Webbs' computer

At that same hearing on June 18, the parties also reported that the Webbs had testified that data on their computer had been lost due to a virus. The Webbs offered to make their computer available for inspection, and were ordered to "cease all operations of their home computer and convey that computer to plaintiffs' counsel immediately." (Dkt 81.) The Webbs were further ordered to pay the reasonable cost incurred by CBS to create a mirror image of the hard drive. (Dkt 85.) Pending the outcome of that examination, decision was reserved as to the subjects of CBS's present renewed motion: whether the Webbs should pay for the examination of the hard drive, and whether they should bear the cost of further deposition testimony regarding any documents found. (*Id*.) The Webbs, by their counsel, subsequently waived attorney-client privilege as to any documents located during the forensic examination. (*See* dkt 136, Ex. M at 16-20.)

CBS retained James Murray, a computer forensics expert, to conduct the examination of the Webbs' computer. (Dkt 136, Suppl. Larsen Decl. ¶ 3.) Mr. Murray was charged with determining:

(1) whether a virus had infected the computer; (2) whether documents containing search terms provided to him by CBS resided on the computer; and (3) if such documents did reside on the computer, whether plaintiffs would have been able to access those documents themselves. (Dkt 137, Decl. of James Murray ¶ 4.)[4]

Mr. Murray found no evidence of a virus on the Webbs' computer; however, he could not definitely state that a virus had not been present in the past but later eliminated by the use of an anti-virus software program. (Murray Decl. ¶ 8.) Mr. Murray was able to take a forensic image of the Webbs' hard drive and search it using the terms provided to him by CBS, which turned up a number of user-generated files like e-mails, photographs, and documents, as well as "text fragments" of documents that exist or once existed. (*Id.* ¶¶ 5-7.) He determined that the Webbs would have been able to locate the user-generated files with a simple search of their hard drive folders and Outlook Express, an e-mail program that does not require specialized or technical knowledge. (*Id.* ¶ 10.) On the other hand, he concluded they would not have been able to locate the "text fragments" without the assistance of special software. (*Id.* ¶ 11.)

Some of the documents turned up by Mr. Murray's search are plainly responsive to CBS's document requests. For example, e-mails were found between the Webbs and Amy Jacobson and between the Webbs and a magazine reporter discussing the July 6 videotaping. (Dkt 136, Exs. B, C, E).

Of particular concern are e-mails Mr. Murray found between the Webbs and their counsel dated January 17, 2010, indicating that Jill Webb faxed her counsel a copy of the private

---

[4] Examples of the search terms provided to Mr. Murray include "Amy Jacobson," "CBS or CBS-2," "Tracy Reardon," "Lisa Stebic," "Media Interviews," and "videotape." (Murray Decl., Ex. B.)

investigator's report on that date. (*Id.*, Ex. J.)[5]  The Webbs had not produced the report in response to CBS's November 2009 discovery requests, nor had they served a privilege log listing that document and asserting a privilege for withholding it as a party claiming a discovery protection is obligated to do. *See* Fed. R. Civ. P. 26(b)(5).  As discussed above, both Mr. and Ms. Webb testified at their June depositions that they did not know what happened to the report.  (J. Webb Dep. at 343-45; R. Webb Dep. at 113-14.)  That testimony is contradicted by Ms. Webb's faxing of the report to her counsel in January 2010, after CBS had propounded its document requests to the Webbs, and less than two months before their affidavits stating that they were not in possession of any requested documents.

E.      Second depositions of the Webbs

On October 9, 2010, CBS took further depositions of Mr. and Ms. Webb in order to examine them about the documents Mr. Murray discovered, the photographs, the private investigator's report, the medical records, and 84 additional hard copy documents the Webbs produced four days prior, on October 5, 2010.  (Dkt 136, Exs. N, O, Cont. Dep. R. Webb, Cont. Dep. J. Webb.)  According to CBS, those additional documents included printouts of Internet blog posts made by the Webbs. (Dkt 135 at 10.)  Apparently, Mr. and Ms. Webb posted messages on various websites in relation to the disappearance of Lisa Stebic and the July 6 videotape.  (Cont. J. Webb Dep. at 446-47; Cont. R. Webb Dep. at 173.)

When questioned about the e-mails Mr. Murray found on the Webbs' computer, Jill Webb

---

[5]  The e-mail from Jill Webb to her counsel stated in part, "I have also faxed you a copy of the report from the private investigator Amy's [Jacobson's] attorney hired, where Tracy admits to taking the video and giving it to Mike."  (Dkt 136, Ex. J.)

admitted to creating some of them, but maintained that she had searched the computer and had not found those emails or any other documents responsive to CBS's discovery requests. (*See* Cont. J. Webb Dep. at, 417, 424, 426-28.) She testified that to obtain the medical records, she had "called up [her] physician]" and asked for copies, although she could not remember when she had done so. (*Id.* at 396-97.) She first testified she believed she had contacted her physician before the June 2010 deposition, but after prompting from her counsel stated she could not specifically recall. (*Id.*)

Robert Webb gave confusing and contradictory testimony about his search of the Webbs' computer. First, he testified again, as he had in June, that he never searched the computer at any time before the June deposition. (Cont. R. Webb Dep. at 136.) However, when confronted with his March 5, 2010 affidavit attesting that he had done a "full search" in response to CBS's discovery requests, Robert Webb changed his story and stated that he had done a computer search for "stuff . . . related to Amy Jacobson" possibly before the June deposition although he could not recall. (*Id.* at 141-43.) He also testified that at some point, he was able "reconfigure" the computer after it acquired a virus, and was thereafter able to access some files, including the photographs he had taken on July 6, 2007. (*Id.* at 137.) However, he testified that he searched the computer for terms like "Amy Jacobson" and "Stebic case" after his June deposition but "couldn't bring anything up." (Cont. R. Webb Dep. at 137, 141-44.) Confronted with the e-mail correspondence that the computer search had disclosed, Robert Webb also admitted that he had communicated by e-mail with Amy Jacobson at least as recently as July 2008 (a short time before this lawsuit was filed) and that "it's possible" he had deleted those e-mails in the "normal course" of using his computer. (*Id.* at 170.)

As for the hard copy paper documents, including printouts of internet blog postings, that had just been produced, Mr. Webb testified that he found them in a file that at one time had been in his

office.  (*Id*. at 170-71.)  He began maintaining a file of such documents in 2007 and added to it at least up until at least July 2008, a short time before the lawsuit was filed.  (*Id.* at 171.)  He stated that the documents had been in a file cabinet at work until he got demoted "eight months ago, maybe longer" (which would have been February 2010), when he brought the cabinet home and put it in the Webbs' garage, but he "forgot about them" in March 2010 (when he signed his affidavit).  (*Id*. at 145-46.)

Their story about the private investigator's report grew considerably more complex.  When confronted with her January 17, 2010 email to her counsel in which she transmitted the report, Jill Webb admitted that she had, in fact, been in possession of the report on that date, despite her earlier testimony that she did not recall what she had done with it.  (Cont. J. Webb Dep. at 412-14.)  She further testified that, when giving their attorney information to respond to CBS's interrogatories, the Webbs had listed the private investigator as a source of information for some allegations of the complaint, and stated that "Tracy [Reardon] admitted to the PI [private investigator] that she indeed shot the video and gave it to Mike."  (*Id.* at 406-08; *see also* dkt 158, Ex. A, Aff. John DeRose.)  But the Webbs' answers to the interrogatories as served on CBS in March 2010 made no reference to the private investigator or his report.  (*Id.* at 408; *see also* dkt 54, Ex. A.)


F.    The renewed motion for sanctions

In response to CBS's renewed motion for sanctions based on those facts, the Webbs apparently do not dispute that at least some of the items Mr. Murray located on their computer, as well as the documents they produced after their June depositions (the medical records, the photographs, the internet blog postings) and the private investigator's report, are responsive to CBS's

discovery requests. (*See* Dkt 158.) Rather, they contend that: (1) the e-mails recovered by Mr. Murray were extracted with sophisticated equipment and the Webbs did not possess the computer skills to find them; (2) they turned over the photos after their first round of depositions, and did not realize they should have done so earlier; (3) they were not required to produce their medical records, including the medical bills referred to in their complaint because they had already given CBS the names of their treating physicians, but they ultimately obtained and produced medical records; and (4) the private investigator's report was not disclosed because the Webbs' counsel received a copy of it from Amy Jacobson's counsel (before the Webbs sent it to him in 2010) and was told it was subject to attorney-client privilege. (*Id.* at 2-6.)

After reviewing the evidence described above, the court concludes that the affidavits signed by the Webbs and filed by their counsel were false and that the Webbs and their counsel knew they were false when the affidavits were signed and filed. If the Webbs had, in fact, "thoroughly read . . . and understood" CBS's request for documents, as they swore, they would have known that the requests covered the photographs taken on the date of the videotaping, as well as their e-mail communications with Amy Jacobson and other reporters, their blog printouts and other paper documents kept in Robert Webb's file cabinet, and the private investigator's report. Their statements that they each conducted a "full search" and that they were not and had not been in possession or control of any of the requested documents are belied by their deposition testimony and the subsequent revelation of documents on their computer and in their files.

The Webbs' first depositions were incomplete as a result of their failure to fulfill their responsibilities as parties under the Federal Rules of Civil Procedure to produce documents in their custody and control. Even without considering the documents located on the Webbs' computer, the

fact that the Webbs produced medical records, photographs and hard copy documents after their first depositions necessitated resuming their depositions and justifies requiring them to pay the costs CBS incurred because the depositions had to be resumed.  The Webbs proffer no excuse why the hard copy documents residing in Robert Webb's file cabinet were not produced prior to the June deposition, other than that he "forgot" about them.

As for the late-tendered medical records, the Webbs were repeatedly put on notice by the court of their obligation to preserve and produce documents relevant to their claimed damages, including the "medical bills" referred to in their complaint.  (May 25, 2010 Op. at 9-12.)  Their response to the present motion cites no authority to support their suggestion that telling CBS the names of the Webbs' treating professionals satisfied that obligation.  (*See* dkt 158 at 4-5.)  CBS properly resumed the Webbs' depositions after those medical records were produced.

The forensic search of the Webbs' computer was also necessitated by the Webbs' failure to fulfill their responsibilities as parties and by their misleading statements.  Initially, the Webbs swore that, after a "full search," they did not have and never had any responsive documents.  But Robert Webb testified that he had *not* searched his computer for documents prior to the first deposition. Then came the explanation of the computer virus.  Mr. Murray's forensic search found no virus, and the Webbs have submitted no evidence to dispute that conclusion. Their sole excuse for the failure to produce documents on their computer is that they are "unsophisticated computer users." (Dkt 158 at 2.)  But, at his continued deposition, Robert Webb testified that he had "reconfigured" the computer and accessed some files including the photographs *before* he turned the computer over to his counsel.  When the forensic search disclosed a number of documents, the Webbs were forced to admit that they had used their computer to post on internet blogs and communicate with Amy

Jacobson and others about the videotaping. Importantly, they do not explain why they did not disclose in their affidavits or in response to CBS's document requests that they had documents, including e-mails, on their computer at one time but that those documents were inaccessible due to a virus (if in fact, such a virus occurred). Furthermore, as Robert Webb testified, it is "possible" that the Webbs deleted those e-mail communications, but they did not disclose that fact in their discovery responses.

The Webbs' and their counsel's concealment of the private investigator's report is a very troubling aspect of this history. That report was clearly responsive to CBS's discovery requests and provided a factual basis for some of the allegations in their complaint. The Webbs' lead counsel states in an affidavit that he received a copy of the report from Kathleen Zellner, counsel for Amy Jacobson, before Jill Webb sent it to him (in January 2010). (DeRose Aff. ¶ 7.) He admits that he instructed his co-counsel to delete any mention of the report in preparing the Webbs' answers to CBS's document requests, on the ground that Ms. Zellner was asserting work product protection about it. (*Id.* ¶ 10.) He does *not* explain why the document was not listed on a privilege log, why they concealed both the document's existence and the fact that he and Jill Webb possessed it, and why his clients signed and submitted affidavits saying affirmatively they had no documents, when that plainly was not true. Equally troubling is the testimony from both Mr. and Ms. Webb, under oath, in June 2010, that they did not know what they had done with the investigator's report when in fact Jill Webb had sent the report to their counsel just a few months earlier, in January 2010. But for Mr. Murray's examination of the computer, it might not have come to light that the Webbs and their counsel possessed the private investigator's report at the time their initial discovery responses were sent and that it provided a basis for the allegations of their complaint.

The actions and misrepresentations of the Webbs and their counsel required CBS to resume the Webbs' depositions and to hire Mr. Murray to do the forensic search of their computer. CBS's renewed motion for sanctions is granted, pursuant to Federal Rule of Civil Procedure 37(a)(5)(A) and the inherent authority of the court. "[T]he inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct." *Chambers v. NASCO, Inc*. 501 U.S. 32, 49 (1991); *Methode Elecs., Inc. v. Adam Techs., Inc*., 371 F.3d 923, 927 (7th Cir. 2004) (quoting *Chambers v. NASCO*, 501 U.S. at 49).

## II.    The *Jacobson* documents

The *Jacobson* documents were a major part of the dispute between CBS and the Webbs leading to the discovery motions decided in the January 13, 2011 Opinion. (*See* Jan. 13, 2011 Op. at 18-21.) To recap briefly, CBS produced the certain documents, subject to a protective order, in a state court lawsuit (*Jacobson v. CBS Broadcasting, Inc.*, No. 2008-L-007331 (Cir. Ct. Cook Co., Ill.) brought by Amy Jacobson arising out of the videotaping incident. CBS did not produce in this case all of the documents that it had produced in the *Jacobson* case, because substantially all of the *Jacobson* documents are not relevant to this case. (March 8, 2011 Op. at 6-7.)[6] Somehow, the Webbs' counsel obtained the *Jacobson* documents, but later claimed that the documents were "'removed' or 'purloined' from his files." (Dkt 111 ¶ 20.) Based on statements made by the Webbs' counsel (described further below), both CBS and the court believed that the Webbs' counsel no longer had the *Jacobson* documents. (*See, e.g.*, Jan. 13, 2011 Op. at 5: "The Webbs' counsel,

---

[6] As used herein "*Jacobson* documents" refers to those documents that were produced by CBS only in the *Jacobson* case. It does not include those documents that CBS produced both in the *Jacobson* case and to the Webbs in this case.

however, no longer had the *Jacobson* documents, only his notes about them.")

In ruling on the discovery motions, this court held that the Webbs' counsel's use of the *Jacobson* documents at the depositions was improper and contrary to the protective order in the *Jacobson* case. (Jan. 13, 2011 Op. at 19.) After *in camera* review of all of those documents, this court found that only two additional documents and one sentence of one more document were discoverable in this case. (Dkt 187.) The Webbs' objections to those decisions were overruled by the District Judge. (March 8, 2011 Op. at 7.)

On February 7, 2011, while the Webbs' objections to the January 13, 2011 Opinion were pending, CBS learned for the first time that the Webbs' counsel was holding copies of the *Jacobson* documents, not just notes about them. (dkt 193, Decl. Brian Sher ¶¶ 10-11.) According to CBS, the Webbs' counsel stated that, notwithstanding the protective order in the *Jacobson* case and the January 13, 2011 Opinion, he planned to use the *Jacobson* documents in the trial of this case. (Sher Decl. ¶ 13.) CBS then filed its current motion for return of the documents and for sanctions. (Dkt 191.) This court ordered the immediate return of the *Jacobson* documents to CBS, and that ruling was also affirmed by the District Judge. (Dkt 196; March 8, 2011 Op. at 8.) The current question is whether the Webbs' counsel's actions justify sanctions.


A.     The Webbs' arguments

Regrettably, the Webbs' response to the motion continues in the mode that has brought this case to this posture. They make a number of unpersuasive arguments that fail to address a central issue on the motion: did the Webbs's counsel mislead the court and CBS about the fact that he was still holding the *Jacobson* documents?

The gravamen of Webbs' response is that they are entitled to the *Jacobson* documents and that they did nothing wrong in dealing with them. Their primary argument about the relevance of the *Jacobson* documents to this case is, however, both moot and off-point. The District Judge has affirmed the ruling that only two of the *Jacobson* documents are discoverable here.

The Webbs also claim that their counsel did not know about the *Jacobson* protective order when he received the documents. That claim is dubious, given the markings on the documents. But even assuming, *arguendo*, that he did not know of the *Jacobson* protective order at the time he received the documents, he was certainly aware of it no later than August 18, 2010, when a CBS employee was deposed. As soon as the Webbs' counsel started to ask questions about one of the *Jacobson* documents, CBS's counsel stated, "This document that you're asking about was produced by CBS to Ms. Zellner on behalf of Ms. Jacobson in the *Jacobson* litigation *subject to a protective order* and stamped confidential." (Dkt 209, Ex. B at 220 (emphasis added).) Also, in a letter to the Webbs' counsel on August 26, 2010, CBS's counsel quoted the *Jacobson* protective order. (Dkt 209, Ex. A at 2.) Notwithstanding those facts, the Webbs now state in their response filed on March 7, 2011 (six months later):

> Plaintiffs and their counsel *have never seen* the Protective Order in the *Jacobson case*, are not privy to it, and respectfully suggest that they could not reasonably be expected to be bound by an order *they have never seen* – particularly when it is *apparently* at odds with the Agreed Protective Order in this case!

(Dkt 202 at 3 (emphasis added).) That statement is, of course, plainly untrue, since the *Jacobson* protective order was attached as an exhibit to an earlier CBS motion in this case. (Dkt 93, Ex. C.) Moreover, how could an attorney be told that he is holding documents that are subject to a court order and not review the order to comply with it?

The January 13, 2011 Opinion stated, "The Webbs' counsel's use of the *Jacobson* documents was contrary to the protective order in the *Jacobson* case." (Jan. 13, 2011 Op. at 19.)[7] The Webbs' counsel was then on notice – at the very latest – that any use of those documents by the Webbs was improper. (The court had no idea at that time that the Webbs' counsel was still holding the *Jacobson* documents.)

Additionally, the Webbs argue that their actions *vis-a-vis* the *Jacobson* documents were appropriate under the protective order entered in this case. That is both legally and factually wrong. The protective order entered in this case covers documents produced in this case; it does not apply to information obtained other than through discovery in this case. (Agreed Protective Order ¶¶ 12, 14 [dkt 64].) The *Jacobson* documents were *not* produced in discovery in this case; that is the whole controversy. The Webbs' counsel got them from Kathleen Zellner, Amy Jacobson's lawyer in the *Jacobson* case. (Dkt 202 at 4.) As the Webbs have admitted, their counsel knew that the documents had been produced by CBS in the *Jacobson* case, and they are plainly marked "confidential." (*See* dkt 130 ¶ 11.) As a factual matter, the Webbs did not bring the disputes about the *Jacobson* documents to the court's attention until *after* CBS filed *its* motion for a protective order. (*Compare*

---

[7] That opinion explained:

The *Jacobson* documents obtained by the Webbs' counsel are covered by a protective order entered by the state court, which provides that "confidential" information will be used "solely for purposes of this [the *Jacobson*] action," and disclosure will be limited to specific categories of persons including Ms. Jacobson, her counsel and her counsel's staff. (*Jacobson* Protective Order ¶ 5.) Those categories do not include the Webbs or their counsel. "[U]nder no circumstances" are counsel in the *Jacobson* case permitted to allow "counsel for any other person or entity to review documents . . . produced pursuant to th[at] Order or any copies thereof." (*Id*. ¶ 6.)

(Jan. 13, 2011 Op. at 18-19.)

dkt 93 *with* dkt 99 [stricken and replaced with dkt 109.])  The Webbs' motion did not even mention the protective order entered in this case, nor suggest any concern about a conflict between the protective order in the *Jacobson* case and the one entered into here.  (*See* Dkt 109).  Their current professed concern about the *Jacobson* protective order being "at odds" with the one entered in this case is an after-the-fact rationalization.

Finally, the Webbs argue that their counsel would have seen the documents in any event through his participation in the depositions held jointly in this case and the *Jacobson* case.  As CBS points out, the *Jacobson* protective order precludes Amy Jacobson's counsel from showing the *Jacobson* documents to anyone but a limited group of persons that does not include the Webbs or their counsel.  (Dkt 93, Ex. 3 ¶¶ 5-6.)  CBS also states that Amy Jacobson's counsel did not question any of the deponents in the joint depositions about any of the *Jacobson* documents with the exception of one document that was discussed in advance with CBS's counsel.  (Dkt 209 at 4-5.)  The Webbs do not say that any of the *Jacobson* documents were *actually* used by CBS or Amy Jacobson's counsel in the joint depositions, only that CBS could not "reasonably expect" that the Webbs' counsel "would not come in contact" with the documents.  (Dkt 202 at 4.) The Webbs cannot justify their counsel's actions by anticipating a waiver that never occurred.

B.     Whether the Webbs' counsel misled the court and CBS about his retaining the *Jacobson* documents

Only at the end of their response do the Webbs address a major issue here: did their counsel mislead the court and CBS about the fact that he was holding on to copies of the *Jacobson* documents?  The Webbs now state:

> Plaintiffs' counsel truthfully advised the Court that copies of the exhibits bearing his notations only were purloined from his files at the request of CBS. That statement was true then and remains true now. . . . No one ever asked plaintiffs' counsel if he had additional copies of the exhibits. Plaintiffs' counsel freely told others and never hid the fact that he had additional copies of the exhibits.

(Dkt 202 at 10-11.) The record, however, paints a different picture.

CBS specifically asked the Webbs' counsel if he had additional copies of the *Jacobson* documents. On August 23, 2010, CBS's counsel wrote to the Webbs' counsel reporting that Amy Jacobson's attorney told CBS that she had "taken possession of" the *Jacobson* documents. (Dkt 193, Ex. A.) CBS's counsel stated, "If you made any additional copies of these materials or if any of them remain in your possession, I ask that you notify me immediately." (*Id*.) The Webbs' counsel admits that he never responded to that letter. (Dkt 202 at 10; *see also* Sher Decl. ¶ 8.) Two days later during the deposition of Elizabeth Fruehling, the Webbs' counsel said to CBS's counsel about the *Jacobson* documents, "You guys *took them all* from my file . . . . *I don't have them*." (Dep. of Elizabeth Fruehling at 128-29 (emphasis added).)[8] The Webbs' counsel misled CBS about the fact that he was retaining copies of the *Jacobson* documents.

As quoted above, the January 13, 2011 Opinion likewise reflects the court's belief that the Webbs' counsel's only copies of the *Jacobson* documents had been "purloined" from his files. In hindsight, it is apparent that the Webbs' submissions on the motions leading up to the January 13, 2011 Opinion were carefully phrased to create the impression that the Webbs' counsel did not have the *Jacobson* documents when, in fact, he had copies of them.

For example, in Plaintiffs' Motion to Compel, Motion to Enjoin and Motion for Sanctions, the Webbs stated:

---

[8] The deposition transcript was submitted to the court *in camera.*

> [P]laintiffs' counsel arrived at the deposition to find that many documents had been "removed" from the files of plaintiffs' attorney . . . and *will not be returned to him "without a court order.*"

> .   .   .

> Among others, Plaintiffs' counsel *knows the following documents exist*, were not produced in discovery, *were purloined from his files* [by] counsel with the knowledge and consent of CBS, bear only his personal notations on them, and about which he was precluded by CBS from inquiring . . . .

(Dkt 109 ¶ 8, 20 (emphasis added).)   That statement is followed by an eight-page list of e-mails designated with "CBS Bates Stamp" numbers, and the following footnote:

> The statements attributed in each exhibit are *paraphrases from the notes of Plaintiffs' counsel* and *are represented to be reasonably accurate.*   Any statement in bold print *is believed to be* a direct quote from the exhibit.

(*Id.* ¶ 20 n. 1 (emphasis added).)

There is no other explanation for that convoluted phrasing except an effort to lead the reader to believe that because "the following documents . . . were purloined" from the Webbs' counsel, he no longer had access to them and, thus, he had to rely on his notes and his "belief" that the "paraphrases from [his] notes" were "reasonably accurate."   Now the Webbs' counsel admits he was holding copies of the *Jacobson* documents at the time he wrote those statements.   He says, though, that he "put [them] aside" and only used his "Table of Exhibits" to draft and respond to motions. (Dkt 202 at 11.)   What difference does that make?   If the Webbs really believed, as they now claim, that they had a right to those documents, why didn't their counsel simply acknowledge that he was holding them and quote directly from them?   The obvious answer is: he knew he should not have copies of the *Jacobson* documents and that if he revealed that he did, CBS would seek an order to have them returned, which is exactly what happened.   The fact that he "put [them] aside" while

writing the motions instead of candidly stating that he was holding them evidences counsel's awareness that he should not have had them at all.

The suggestion in the Webbs' motion that their counsel no longer had the *Jacobson* documents became more emphatic the Webbs' response to CBS's discovery motion:

> *Before they were surreptitiously taken* from Plaintiffs' Counsel at the depositions already commenced, he *had in his possession* documents turned over by CBS in the *Amy Jacobson v. CBS Broadcasting, Inc.* [case] bearing Bates Stamp Numbers from "CBS-2/Jacobson 00001" through "CBS-2/Jacobson 00443".

(Dkt 130 ¶ 11 (emphasis added).)  By these many statements, the Webbs' counsel deliberately misled CBS and the court into believing that he no longer had them.

Notably, when the January 13, 2011 Opinion was issued expressing this court's mistaken impression that the Webbs' counsel no longer had any of the *Jacobson* documents, the Webbs' counsel did not come forward to correct that impression.[9]


### C.    Counsel's obligations

From the foregoing facts, the court concludes that the Webbs' counsel knew that the way he had obtained the *Jacobson* documents was at best questionable, and knew or suspected that his retention of those documents was a violation of the *Jacobson* protective order.  For that reason, he concealed from CBS and the court the fact that he held copies of those documents while he was trying to get an order that they were discoverable in this case.

The enforcement of the *Jacobson* protective order, including any proceedings relating to

---

[9] The Webbs' motion to the District Judge to reconsider the January 13, 2011 Opinion did not mention the *Jacobson* documents, let alone correct the mistaken impression their counsel  had created.  (*See* dkt 182.)

contempt of that order, are for the state court that entered it.  The issue here is whether the Webbs'

counsel's actions violated any obligations of counsel to this court and to the opposing party.

In their response to the present motion, the Webbs' counsel states that he was not "required

by law" to honor  CBS's request that its counsel be notified if the Webbs' counsel had any additional

copies of the *Jacobson* documents.  (Dkt 202 at 10.)   Under the Illinois Rules of Professional

Conduct, a lawyer who receives a document relating to the representation of the lawyer's client and

knows that the document was inadvertently sent must promptly notify the sender.  Ill. R. Prof.

Conduct 4.4(b).[10]  The purpose of notice is to allow the sender to take protective steps.  Ill. R. Prof.

Conduct 4.4, Cmt. 2.   The principle of Rule 4.4 – respect for the rights of others – carries an

obligation to deal candidly with CBS about its documents that were plainly marked "confidential."

The obligation that exists where there is an inadvertent sending applies *a fortiori* to the circumstances

under which the Webbs' counsel obtained the *Jacobson* documents and continued to hold them after

being put on notice of the *Jacobson* protective order.  As another court recently stated:

> Many courts, this Court included, fail to see why this same duty to disclose should
> cease where confidential documents are sent intentionally and without permission. *See
> Burt Hill [Inc, v. Hassan]*, 2010 WL 419433, at *4-5 (collecting cases).  If anything,
> the duty to disclose should be stricter when a party obtains the documents outside
> legitimate discovery procedures.

*Chamberlain Group, Inc. v. Lear Corp.*, 270 F.R.D. 392 (N.D. Ill 2010).

An attorney has obligations to the court as well as  to opposing counsel.  "In appearing in a

professional capacity before a tribunal, a lawyer shall not: (1) make a statement of material fact or law

to a tribunal which the lawyer knows or reasonably should know is false."  N.D. Ill. Local R. Prof.

---

[10]  The ABA Model Rule of Professional Conduct 4.4(b) is similar: "A lawyer who receives
a document relating to the representation of the lawyer's client and knows or reasonably should
know that the document was inadvertently sent shall promptly notify the sender."

Conduct 83.53.3. The Illinois Supreme Court's Rules of Professional Conduct similarly state, "A lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." Ill. R. Prof. Conduct Rule 3.3(a). The commentary to that Rule states, "[T]he lawyer must not allow the tribunal to be misled by false statements of law or fact or evidence that the lawyer knows to be false." *Id*. at Cmt. 3.

Whether the Webbs' counsel's misleading statements at the Fruehling deposition and in the court filings are characterized as falsehoods or half-truths is not material. "[A] half-truth . . . can be just as misleading, sometimes more misleading, than an absolutely false representation." *In re Ronco, Inc*., 838 F.2d 212, 218 (7th Cir. 1988). "There are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation." N.D. Ill. Local R. Prof. Conduct 83.53.3 Cmt.; *see also, e.g., Cleveland Hair Clinic, Inc. v. Puig*, 200 F.3d 1063, 1067 (7th Cir. 2000) (sanctioning lawyer for misleading the court about his involvement in related state court case). "Lawyers have a duty of candor to the tribunal. Counsel . . . would be well-advised to observe that violations of this duty can lead to sanctions even more severe than payment of an opponent's fees and costs." *Id.* (quoting *Beam v. IPCO Corp*., 838 F3d 242, 249 (7th Cir. 1988)).

The court finds that the Webbs' counsel violated his duties to both the court and to opposing counsel. Had that counsel candidly admitted that he was holding copies of the *Jacobson* documents, the court would have included an order for their return as part of the January 13, 2011 Opinion. As a result of the Webbs' counsel's violation, CBS was required to file an additional motion to compel return of the documents, with resulting additional briefing and additional time spent by this court unraveling the tangled skein of misstatements.

### III.	Subpoena to Plainfield Police Department

The factual background of this episode is simpler.  To summarize: the Webbs served a subpoena on the Plainfield Police Department six weeks after the close of discovery, without serving CBS with notice and a copy of that subpoena, and notwithstanding an order expressly forbidding any additional discovery without the court's permission.

On March 9, 2010, a fact discovery cut-off was set:  all fact discovery was required to be noticed in time to be completed by October 27, 2010. (Dkt 65.)  On October 26, 2010, this court ordered:

> Parties are permitted to complete previously noticed discovery and any future discovery permitted or compelled pursuant the pending motions [referring to the motions later decided in the January 13, 2011 Opinion].  No additional discovery may be noticed or served without permission of the court pursuant to a motion identifying specific discovery.

[Dkt 145.]  The next day, the Webbs' counsel sent the court a letter concerning two depositions that he had "neglected to advise the Court" about, those of Nathan De Lack and Anita Guillen.  (*See* dkt 146.)  As a courtesy to the Webbs' counsel, the letter was docketed and treated as a motion for additional discovery, but the parties were reminded, "The parties are directed to file any and all subsequent requests for additional discovery as motions to the court pursuant to the order entered on 10/26/10 and not by way of letter."  [Dkt 147.]

Subsequently, the case was reassigned to a different District Judge and the parties filed a joint status report with that District Judge on November 10, 2010.  (Dkt 153.)  That report, which was signed by counsel for the Webbs as well as counsel for CBS, told the District Judge that "[f]act discovery closed on October 28, 2010."  (*Id.* at 2.)  It also summarized the October 26 order requiring

court permission for any further discovery. (*Id*. at 3.) The status report said nothing about seeking discovery from the Plainfield Police Department.

Notwithstanding all of that and without any motion to or permission from the court, in December 2010, the Webbs served a subpoena for the production of documents on the Plainfield Police Department returnable on December 15, 2010. (Dkt 210, Ex. 2.) The Webbs' counsel said in a letter to CBS's counsel dated December 12, 2010 that he had served a subpoena on the Plainfield Police Department as part of a list of discovery issues. (Dkt 217, Ex. 2.) But it is undisputed that CBS never received notice of that subpoena as required by Federal Rule of Civil Procedure 45(b)(1).[11] The subpoena does not show a certificate of service, and the Webbs' responses to the current motion do not say that an actual notice of the subpoena was ever served on CBS, other than the letter. (*See* dkt 213, 217, 231.) In March 2011, the Webbs' counsel sent CBS's counsel a copy of the documents produced by the Police Department. (Dkt 210, Ex. 1.) CBS then filed its supplement to its pending motion for sanctions. (Dkt 210.)[12]

The Webbs were ordered to respond to CBS's supplement and to include a statement of the relevance of the documents subpoenaed and any argument the Webbs have why the case should not be dismissed. (Dkt 211.) Consistent with their approach throughout the various motions, the Webbs'

---

[11]  Federal Rule of Civil Procedure 45(b)(1) provides, "If a subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, then before it is served, a notice must be served on each party. "

[12]  The Webbs observe that CBS' initial filing on this subject said that the first notice CBS had of the subpoena was receiving the documents in March 2011, and that CBS omitted any reference to the December 12, 2010 letter. (Dkt 217 at 2-3.) That is irrelevant to the issue here: the Webbs' violation of the court's orders. Moreover, in light of the orders entered closing discovery and requiring a motion before any new discovery could be served, it is not surprising that CBS did not focus on the reference in the letter as notice that the Webbs had served an additional subpoena.

response (dkt 213) discusses irrelevant matters at some length but fails to provide any justification for their violating the court order, the close of discovery and Rule 45(b)(1).

With respect to the October 26, 2010 order, the close of discovery and the representations to the District Judge in the status report, the Webbs state only, "Plaintiffs' counsel did not perceive that he was required to seek approval from this Honorable Court before issuing the subpoena *duces tecum*. It was not a discovery issue that plaintiffs' counsel thought he had to bring to the Court's attention." (Dkt 213 at 4.) That's it. No explanation other than the Webbs' counsel didn't think he had to bother to serve notice, bring a motion or get the court's permission.[13]

The Webbs' explanation of the supposed relevance of the subpoenaed documents demonstrates how far afield their focus has gone from the relatively modest claim actually at issue in this case. The documents relate to what appears to be an ongoing feud between Craig Stebic and his neighbor Tracy Reardon, people who are not even parties to this case.

Ms. Reardon was initially named as a defendant but she was never served with process. (*See* dkt 153 at 2.) The Webbs' amended complaint alleges that Ms. Reardon, a neighbor of Craig Stebic, gave CBS a tip that Amy Jacobson was at the Stebics' home on July 6, 2007, and that Ms. Reardon or CBS's Mike Puccinelli recorded the original videotape and gave it to CBS's employees. (Dkt 30 ¶¶ 25-37.) The Webbs further allege that Ms. Reardon's motive in videotaping was purely malicious and based on her dislike of Craig Stebic and Amy Jacobson. (Id. ¶ 27.) But, having never served her, the Webbs agreed in November 2010 to dismiss all claims against Ms. Reardon with prejudice. (Dkt

---

[13] The Webbs try to create an impression that the subpoena served was a trial subpoena: "[T]he Plainfield Police Department Records Keeper was requested to produce the records to be used in the trial of the cause." (Dkt 213 at 4.) That is simply not true. The subpoena was not a trial subpoena. No trial date has been set, and the subpoena was returnable on December 15, 2010 at the Webbs' counsel's office. It was clearly for discovery.

163.)

The following month, December 2010, the Webbs took the depositions of Ms. Reardon and William Alstrom who lives with her. As described in the Webbs' response, the Webbs' counsel questioned them at length about the spats between Ms. Reardon and Mr. Alstrom[14] on the one hand and the Stebics on the other. (Dkt 213 at 7-10.) The Webbs then served the subpoena requiring the Plainfield Police Department to produce thirteen categories of documents and things, including:

> 5. Documentation of any and all calls, complaints, charges or reports made or filed by Bill Hallstrom and/or Tracy Reardon concerning their residence at 13215 Blakely Drive in Plainfield, Illinois within the last five years.
>
> 6. A clear and audible tape recording of all 911 and/or non-emergency phone calls made from 13215 Blakely Drive in Plainfield, Illinois within the past five years.
>
> .   .   .
>
> 8. Any video footage of the Stebic children Alexi and Zak allegedly trespassing or running from the home of Tracy Reardon and Bill Hallstrom on 13215 Blakely Drive in Plainfield, Illinois made by the police cameras mounted on Red Star Drive and Blakely Drive in Plainfield, Illinois.

(Dkt 210, Ex. 2.)

In response to the question why that information falls within the scope of Rule 26, the Webbs state:

> A word about Tracy Reardon, William Ahlstrom and Laurie Bingenheimer: Insensitive, Uncaring Busybodies! The motives of Reardon, Bingenheimer and Ahlstrom in making the recording from behind closed doors and curtains are also at issue in this cause.

(Dkt 213 at 7.) It is not clear why the motives of those people are at issue in this case. All claims

---

[14] The Webbs refer to Mr. Alstrom in their submissions as Bill Alstrom, Bill Ahlstrom and Bill Hallstrom.

against Ms. Reardon were dismissed with prejudice before her deposition was taken and before the subpoena was served. There were never any claims against Mr. Alstrom or Ms. Bingenheimer. How any of those police records would either be admissible or likely to lead to admissible evidence against CBS, the only defendant in this case, is not explained. Had the Webbs sought permission to serve a subpoena on the Police Department for those documents – including 5 years of call records – based on the grounds stated in their present response, that motion would almost certainly have been denied.

The Webbs' counsel, John De Rose, is an experience lawyer who has practiced in the federal courts for many years. He knows the meaning of an order closing discovery, and certainly knew or should have known the meaning of the October 26 order requiring permission to take any further discovery. Plainly, the Webbs and their counsel violated both the order closing discovery and the October 26 order without any plausible excuse for that violation. Accordingly, sanctions pursuant to Rule 37(b)(2) are justified.

## REMEDIES

The Federal Rules of Civil Procedure are to be administered "to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. It is apparent from the foregoing facts that the conduct of the Webbs and their counsel, including false affidavits, misrepresentations, false (or at least misleading) testimony, concealing documents, and disobeying court orders, have prolonged this case and made it much more expensive than it should have been. When those facts are considered together with the facts set out in the January 13, 2011 Opinion, the court must conclude that the Webbs and their counsel have distorted the process of litigating this case beyond any reasonable relationship to the simple claim that is actually at issue.

The Webbs' claim in this lawsuit involves a single incident – the unauthorized videotaping on July 6, 2007, and a single defendant – CBS. Only the videotaping is at issue; any claims involving the broadcast or publication of that videotape were stricken as untimely two years ago. [Dkt 28.] Yet the Webbs apparently refuse to accept the limits of their case, as evidenced by their continued claims to the *Jacobson* documents and their counsel's irrelevant and sometimes bizarre deposition questions to CBS employees as described in the January 13, 2011 Opinion. Now their view of the case has expanded to include an apparent feud between Craig Stebic and his neighbors over the past five years.

Oddly, notwithstanding how strongly the Webbs have expressed the merits of their claim, it appears that they made no effort to preserve documents supporting their claim of damages from the videotaping – the medical bills referred to in the complaint for their claimed treatment for emotional distress. But for Jill Webb's belated effort to get copies from the providers, it appears they would have no evidence of monetary damages at all.

Throughout the course of discovery, the Webbs and their counsel have failed to conform their conduct to meet their obligations: their discovery obligations under the Federal Rules, their obligations of honesty and candor to counsel and the court, and their obligation to comply with court orders. Moreover, this is not just a single incident of misconduct. As set out above, there are multiple instances of each violation. The Webbs failed to serve full and timely responses to discovery; failed to search for and produce relevant documents; filed false affidavits stating that they had done such a search and that they had no such documents; concealed the existence of the investigator's report and concealed their counsel's continued possession of the *Jacobson* documents; and testified that they did not know what they had done with the investigator's report when, in fact, they had sent it to their counsel not long before. Repeatedly, CBS has had to seek and the court has

had to issue orders compelling the Webbs to comply with the obligations in the Federal Rules.  And the Webbs have violated court orders multiple times, disobeying the orders of February 18, 2010, March 9, 2010, and October 26, 2010.

Regrettably, a pattern has emerged of improper conduct by the Webbs and their counsel.  The question before the court is what remedy is appropriate for that conduct.  Any sanction must be proportionate to the wrong.  *Ridge Chrysler Jeep, LLC v. DaimlerChrysler Fin. Servs. Americas, LLC.*, 516 F.3d 623, 626 (7th Cir.2008) (upholding dismissal as sanction for deceiving the court into entering order).  CBS asks for the ultimate sanction – dismissal.  Dismissal can be entered where appropriate under either the court's inherent authority (*Salmeron v. Enterprise Recovery Sys., Inc*., 579 F.3d 787, 793 (7th Cir. 2009)), or pursuant to Federal Rule of Civil Procedure 37 (*In re Thomas Consolidated Indus., Inc*., 456 F.3d 719, 725-26 (7th Cir. 2006) (stating that "[t]he sanction of dismissal under Rule 37(b) [is justified] if the trial court finds that the party against whom these sanctions are imposed displayed willfulness, bad faith or fault")).  In a factual situation strikingly close to this case, the court in *Thomas* affirmed dismissal where the party tendered late discovery responses and lied to suggest that the responses were tendered before the sanctions motion was filed.  "[W]e make express what the courts below implied: the lie about when and where the responses were tendered was evidence of a bad faith breach of the court's discovery order." *Thomas,* 456 F.3d at 726.

Dismissal is appropriate where there is evidence of willfulness, bad faith or fault. *Mayanard v. Nygren*, 332 F.3d 462, 468 (7th Cir. 2003); *Ridge Chrysler Jeep v. DaimlerChrysler,* 516 F.3d at 625-26.[15]  The court finds that the actions of the Webbs and their counsel described above meet that

_____

[15] There is some question about whether the standard of proof is clear and convincing or a preponderance of the evidence. *See Wade v. Soo Line R.R. Corp.*, 500 F.3d 559, 564 (7th Cir. 2007). In *Ridge v. DaimlerChrysler*, the Seventh Circuit observed that its *Maynard* decision (imposing a

31

standard.  While their counsel argues that the Webbs are "Completely Blameless" (dkt 213 at 1), they signed the false affidavits and gave the deposition testimony described above.  Furthermore, "[a]ttorneys' actions are imputed to their clients, even when those actions cause substantial harm. A litigant bears the risk of errors made by his chosen agent." *Wade v. Soo Line R.R. Corp.*, 500 F.3d 559, 564 (7th Cir. 2007).

Significantly, this is not the first time the court has had to sanction the Webbs and their counsel, noting both their failure to comply with discovery obligations and their misrepresentations to the court.  (*See* May 25, 2010 Op.)  In light of the fact that such misconduct – including violation of the court's orders – continued after an initial monetary sanction was imposed, dismissal would be justified.

Notwithstanding the finding in the paragraph above, "dismissal should not be used lightly. The punishment should fit the crime, so fees and fines – which can be scaled as appropriate – are often the best sanction." *Wade,* 500 F.3d at 564.  Here, CBS finally got discovery (putting aside for the moment the fact that some documents may have been destroyed).  But the costs and fees that CBS incurred to get that discovery and to retrieve the *Jacobson* documents that the Webbs' counsel should not have had, were driven up by the Webbs' improper tactics ranging from evasiveness to concealment to outright misrepresentations and violation of court orders.  Those excess costs and fees should be borne by the Webbs and their counsel, not by CBS.  Although the Webbs are individuals and CBS is a corporation, all litigants are equal in the eyes of the law.  The fact that the adversary is

clear and convincing standard) failed to discuss certain Supreme Court decisions holding that heightened burdens of proof do not apply in civil cases unless a statute or the Constitution so requires.  516 F.3d at 625-26.  The circumstances here meet the clear and convincing evidence standard, and accordingly, they also meet the preponderance of the evidence standard.

a corporation, even a large corporation, does not justify a party's disobedience of court orders.

In light of the repeated violations and because the previous sanctions order was not sufficient to deter the Webbs from misconduct, the Webbs should be required to pay the fees and costs they have unjustifiably imposed on their opponent before proceeding further with their case.

## CONCLUSION

Accordingly, CBS's Renewed Motion for Sanctions and CBS's Motion to Compel Return of Confidential Documents and to Dismiss are granted as follows:

1. The Webbs and their counsel, John DeRose, are jointly and severally liable for paying to CBS the following amounts:

(a) Mr. Murray's fee in the amount of $3,241.25 (dkt 137, Ex. C);[16]

(b) the additional costs incurred by CBS to resume the Webbs' depositions ($414.29) (dkt 136, Ex. P);[17] and

(c) the reasonable attorneys' fees and costs incurred by CBS in bringing and briefing the following: CBS's Renewed Motion for Sanctions; CBS's Motion to Compel Return of Confidential Documents and to Dismiss; and CBS's Supplemental Memorandum in support of that, including CBS's response to the Webbs' Motions to Supplement their Reply to the Court's Query. CBS shall calculate that amount as

---

[16] The Webbs were previously ordered to pay the cost of imaging the hard drive on their computer ($885.00). (Dkt 85, 137, Ex. C.) The remaining amount of $2,356.25 is the fee for conducting the search. (Dkt 135 at 14, n. 8; dkt 137, Ex. C.)

[17] In connection with the resumed depositions, CBS is only seeking the hotel bill incurred for their counsel to stay one additional night. (Dkt at n. 9.)

soon as reasonably possible and communicate that amount to the Webbs' counsel.

2.   The payment of the total amount of the sanctions awarded in paragraph 1 above is a condition precedent to the Webbs' filing any other document (including any motion or brief) in this case except an objection to this Memorandum Opinion and Order brought to the District Judge, or a motion objecting to the amount CBS calculates under paragraph 1.

3.   The Webbs are barred from making any use whatsoever of the documents obtained from the Plainfield Police Department in this case or for any other purpose.

4.   Ruling is reserved as to the issue of whether the Webbs should be barred from presenting any evidence of economic or medical damages, until disposition of CBS's anticipated motion for summary judgment.

IT IS SO ORDERED.

_____
Geraldine Soat Brown
United States Magistrate Judge

Dated;   May 6, 2011